# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| **KAREN DENISE JOHNSON** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **in her official capacity as** | ) |
| **Acting Commissioner of Social Security** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

Case No. 15-cv-2053 (GMH)

_____

## <u>MEMORANDUM OPINION</u>

In this action, Plaintiff Karen Johnson seeks reversal of a decision of the Commissioner of Social Security denying her benefits pursuant to the Social Security Act, 42 U.S.C. § 405(g). Before the Court are Plaintiff's motion for judgment of reversal and Defendant's motion for judgment of affirmance.[1] Plaintiff raises two issues. First, Plaintiff argues that the administrative law judge ("ALJ") failed to consider relevant medical evidence and failed to properly develop the administrative record. Second, Plaintiff asserts that the ALJ's decision runs contrary to the general public interest. Neither claim has merit. Upon review of the entire record,[2] the Court will deny Plaintiff's motion and grant Defendant's motion.

---

[1] Following the consent of the parties, this matter was referred to this Court for all purposes.

[2] The relevant docket entries for purposes of this Memorandum Opinion are: (1) Plaintiff's Motion for Judgment of Reversal ("Pl. Mot.") [Dkt. 15]; (2) Defendant's Motion for Judgment of Affirmance and Opposition to Plaintiff's Motion for Judgment of Reversal ("Def. Mot.") [Dkt. 16]; (3) Plaintiff's Opposition to Defendant's Motion for Judgment of Affirmance and Reply in Support of Plaintiff's Motion for Judgment of Reversal ("Pl. Reply") [Dkt. 17]; and (4) the Administrative Record ("AR") [Dkt. 7].

# BACKGROUND

## A.      Legal Framework for Social Security Disability Claims

To be eligible for disability benefits under the Social Security Act, a claimant must be found to be "disabled" by the Social Security Administration ("SSA").  42 U.S.C. § 423(a).  In most cases, to determine whether a claimant is disabled within the meaning of the Act, an ALJ gathers evidence, holds a hearing, takes testimony, and performs a five-step legal evaluation of the claimant using that evidence.  20 C.F.R. § 416.920.

In that evaluation, the ALJ must determine whether:  (1) the claimant is "presently engaged in substantial gainful activity"; (2) the claimant has a "medically severe impairment or impairments"; (3) the claimant's impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation; (4) the impairment prevents the claimant from performing his past relevant work; and (5) the claimant, in light of his age, education, work experience, and residual functioning capacity ("RFC"), can still perform another job that is available in the national economy.  Id.  A claimant's RFC is his ability to perform either past relevant work or any other work available in the national economy.  See Butler v. Barnhart, 353 F.3d 992, 1000 (D.C. Cir. 2004).  According to Social Security Ruling ("SSR") 96-8p, "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities" in a work setting for eight hours per day, five days a week, or an equivalent work schedule.  Titles II & XVI:  Assessing Residual Functional Capacity in Initial Claims, SSR

96-8p, 1996 WL 374184, at *2 (July 2, 1996).[3] In short, it represents the most a claimant is able to do notwithstanding his physical or mental limitations. See Butler, 353 F.3d at 1000.

The claimant bears the burden of proof in the first four steps of the evaluation. Callahan v. Astrue, 786 F. Supp. 2d 87, 89 (D.D.C. 2011). At step five, however, the burden shifts to the Commissioner to identify specific jobs available in the national economy that the claimant can perform. Id. In making this determination, an ALJ may call a vocational expert ("VE") to testify as to whether a claimant can perform other work that exists in the national economy. Id. at 90. A VE may draw her conclusions from a number of sources, including the Dictionary of Occupational Titles ("DOT"). Id. The DOT, last published by the U.S. Department of Labor in 1991, provides a brief description of occupations within the national economy and lists the capabilities that each occupation requires of a worker. See generally Introduction to Dictionary of Occupational Titles (4th ed. 1991), available at 1991 WL 645964. Along with VE testimony, the SSA generally relies on the DOT to determine if there are jobs in the national economy that a claimant can perform given his RFC. See 20 C.F.R. §§ 416.966–416.969.

**B. Relevant Facts**

1. Plaintiff Karen Johnson

At the time of the alleged onset of her disability, Plaintiff was a 40-year-old woman residing in the District of Columbia. AR 20. Plaintiff has a high school education, she worked full-time as a cashier between October 1999 and August 2001, and she worked part-time as a general office clerk between August 2004 and December 2010. Id. at 223.

---

[3] The SSA publishes SSRs that "are binding on all components of the Social Security Administration. These rulings represent precedent[ial] final opinions and orders and statements of policy and interpretations that [the SSA has] adopted." 20 C.F.R. § 402.35(b)(1).

## 2. Plaintiff's Application for Benefits

On June 30, 2011, Plaintiff filed an application for supplemental security income under Title XVI of the Social Security Act. Id. at 14, 30. Plaintiff initially alleged disability beginning June 1, 2003, due to a host of physical impairments, including obesity-related conditions, respiratory ailments, and severe headaches, but the onset date was later clarified to be June 30, 2011. Id. She also filed an application for disability benefits under Title II of the Act, alleging an onset date of December 17, 2010. Id. On November 2, 2011, the Commissioner initially denied Plaintiff's claim, determining that her current symptoms were not severe enough to keep her from working. Id. at 72.[4] Plaintiff requested reconsideration of that decision, but the Commissioner again denied her claim on July 17, 2012. Id. at 82, 100. On September 25, 2012, the Commissioner granted Plaintiff's request for a hearing. Id. at 103. Plaintiff appeared and testified at a hearing held before an ALJ on March 7, 2014. Id. at 28–64. On April 7, 2014, the ALJ denied Plaintiff's claim on the grounds that she could return to her past work as a general office clerk and that she was capable of performing a limited range of light work available in the national economy. Id. at 20–22.[5]

Plaintiff appealed the ALJ's decision, and on September 12, 2015, the SSA Appeals Council denied her request for review. Id. at 1–3. The ALJ's decision thus became the

---

[4] Plaintiff did not appeal her Title II claim beyond this point, AR 30–31, so the Court's evaluation was limited to her Title XVI claim only. The judicial review procedures for both claims are identical. See 42 U.S.C. § 1383(c)(3).

[5] Light work involves

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. . . . If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b).

Commissioner's final decision, see Ryan v. Bentsen, 12 F.3d 245, 247 (D.C. Cir. 1993), and Plaintiff thereafter commenced this action.

### 3. The Administrative Record

An administrative hearing was held in this case before the ALJ. AR 28–64. During this hearing, Plaintiff testified and was represented by counsel. Id. at 28. The ALJ evaluated Plaintiff's symptoms based on evidence in the administrative record, including medical records and opinions, Plaintiff's statements, and testimony from a VE. The Court recounts the relevant portions of the administrative record below.

#### a. Dr. Roger Weir – Treating Physician

On April 14, 2011, Plaintiff saw Dr. Roger Weir, a neurologist, with complaints of pain in her head, back, joints, and hip. Id. at 415.[6] Plaintiff reported "massive headaches" that began in July 2010, asserting that her symptoms prevented her from moving her neck and left her sensitive to loud noises. Id. She rated her pain as a seven out of ten, but it caused no vomiting or nausea. Id. During another visit on June 3, 2011, Plaintiff explained that these headaches initially occurred in 1993, calming down that same year, but had recently returned. Id. at 420. She reported that they began in the morning and could last up to five hours or until Plaintiff either lays down for three hours or spends time in a dark room. Id. Dr. Weir prescribed amitriptyline[7] to treat Plaintiff's headaches. Id. On July 15, 2011, Dr. Weir noted that Plaintiff's headaches had become "a little less severe" and occurred "less often" after a month of treatment. Id. at 421. However, Plaintiff also reported dizziness while on the prescribed medication. Id.

---

[6] Treatment notes, dated April 14, 2011, to July 15, 2011, refer to Dr. Roger Weir, AR 414–24, while treatment notes, dated October 13, 2011, to January 8, 2013, refer to Dr. Robert Weir, id. at 532–36. The Court has no reason to believe that these notes were created by different physicians.

[7] Amitriptyline is a tricylic antidepressant that is also used to prevent migraines. Merriam-Webster Medical Dictionary, "amitriptyline" (rev. ed. 2005), available at http://www.merriam-webster.com/dictionary/amitriptyline#medicalDictionary (last visited June 29, 2016).

Dr. Weir referred Plaintiff for an audiology evaluation, which occurred on December 30, 2011.  Id. at 432.  Plaintiff reported that her dizziness episodes sometimes coincide with migraines and that the episodes usually begin in the morning and last for forty-five minutes.  Id. Based on medical test results, the evaluating physician ruled out migraines as the source of Plaintiff's dizziness but recommended that Plaintiff return to complete the evaluation.  Id. Sometime later, Plaintiff was prescribed cyclobenzaprine,[8] which reportedly helped her pain but made her drowsy.  Id. at 534.  In response, Dr. Weir changed this prescription to methocarbamol[9] on September 13, 2012.  Id.  On July 8, 2013, Plaintiff reported daily headaches that occurred each morning.  Id. at 536.  She continued taking methocarbamol daily to manage them, and Dr. Weir ordered no additional treatment.  Id.  Plaintiff continued to report severe headaches to other treating physicians as recently as August 27, 2013, but no treatments were recommended because these headaches were "being managed by Dr. Weir."  Id. at 483–84.

### b.  Dr. Francisco Hoyos – Sleep Specialist

Plaintiff, complaining of sleeping difficulty, underwent a sleep study on March 20, 2012. Id. at 446.  Dr. Francisco Hoyos evaluated that sleep study.  Id.  Dr. Hoyos noted Plaintiff's periodic leg movement, calculating a "periodic limb movement index" of 29.5 per hour of sleep. Id.  On September 9, 2012, he recommended daily walks to treat this condition.  Id. at 517.  He further confirmed Plaintiff's diagnosis of sleep apnea and opined that a CPAP machine would effectively treat the condition.  Id.  He noted that Plaintiff's sleep efficiency was 48.81% without a CPAP machine, which was below the normal range.  Id. at 445.  Dr. Hoyos recommended that

---

[8] Cyclobenzaprine is a muscle relaxant used to relieve tension headaches.  Merriam-Webster Medical Dictionary, "cyclobenzaprine" (rev. ed. 2005), available at http://www.merriam-webster.com/medical/cyclobenzaprine (last visited June 29, 2016).

[9] Methocarbamol is a skeletal muscle relaxant.  Merriam-Webster Medical Dictionary, "cyclobenzaprine" (rev. ed. 2005), available at http://www.merriam-webster.com/medical/methocarbamol (last visited June 29, 2016).

Plaintiff use the machine nightly and further recommended that Plaintiff seek weight loss, avoid alcohol at bedtime, and avoid driving or operating heavy machinery "until complete resolution of daytime sleepiness." Id. at 446.

### c. Drs. James Grim & Ann Williams – State Agency Consultants

On November 1, 2011, Dr. James Grim evaluated Plaintiff's initial disability claim and determined that she could occasionally lift twenty pounds, frequently carry ten pounds, stand or walk for four hours, and sit for six hours, though Plaintiff could never climb ladders or crawl. Id. at 70. He also noted limited feeling in both of Plaintiff's hands due to carpal tunnel syndrome. Id. at 71. Dr. Grim found that Plaintiff was able to work because her reported limitations conflicted with her medical treatments and reported activities, including grocery shopping and attending a sports camp with her grandnephew. Id. Dr. Grim did not recommend a specific level of work that Plaintiff could maintain, but he denied her disability claim. See id. at 72.

On July 10, 2012, Dr. Ann Williams evaluated Plaintiff's claim during its reconsideration. Id. at 74. Plaintiff reported inability to sleep and that her headaches had worsened. Id. Dr. Williams noted that Plaintiff's regular activities included meal preparation, laundry, gardening, grocery shopping, attending movies, and tutoring her grandnephew. Id. at 78. Further, she noted that Plaintiff can walk up to half a mile. Id. Like Dr. Grim, Dr. Williams determined that Plaintiff could occasionally lift twenty pounds, frequently carry ten pounds, stand or walk for four hours, and sit for six hours, but could never climb ladders or crawl. Id. at 79–80. Dr. Williams opined that Plaintiff could perform "sedentary work." Id. at 82.

### d. Dr. Elliot Aleskow – SSA Consultative Physician

On December 20, 2013, Plaintiff saw Dr. Elliot Aleskow for a consultative examination. Id. at 495. Plaintiff reported constant arthritic pain that prevents her from walking more than

several blocks, sitting more than ten minutes, standing more than fifteen minutes, and lifting or carrying more than ten pounds. Id. at 496. In evaluating Plaintiff's RFC, Dr. Aleskow noted that she had no limitation in her range of motion, including her spine and all four extremities. Id. at 497. Dr. Aleskow also noted that Plaintiff could walk on her heels and toes, could squat and rise from a squatting position, had normal grip strength, and could perform fine motor skills without difficulty. Id. However, Dr. Aleskow included in his medical source statement that Plaintiff could only sit, stand, or walk for short periods of time. Id. at 502. Specifically, Dr. Aleskow opined that, without interruption, Plaintiff could sit up to ten minutes, stand up to fifteen minutes, and walk up to thirty minutes. Id. In a normal eight-hour workday, Plaintiff could sit for two hours, stand for one hour, and walk for one hour. Id. Plaintiff also reported "severe headaches on a daily basis" since 2009, but she never received a diagnosis and she stated that methocarbamol helps manage the pain. Id. at 496. Dr. Aleskow could not determine "the etiology of [Plaintiff's] headaches associated with [her] dizziness," and made no other determination regarding them. Id. at 498.

###### e.    Dr. Elizabeth Wangard – SSA Consultative Psychologist

On December 21, 2013, Plaintiff saw Dr. Elizabeth Wangard for a psychological consultative examination. Id. at 537. Plaintiff reported that she takes several daily medications and that she has difficulty achieving a full night's sleep. Id. at 538. She also reported that her medication causes drowsiness and that her fatigue causes difficulties in recalling factual details of conversations. Id. Dr. Wangard noted Plaintiff's irritable attitude throughout the consultation, which "may have had a negative impact upon her performance" during the evaluations. Id. at 540. Plaintiff discontinued the examination before its completion, complaining of a toothache. Id.

Dr. Wangard's limited evaluation revealed that Plaintiff demonstrated no immediate verbal memory impairments, and Plaintiff's perceived irritability may have affected the results of her immediate visual spatial memory examination.  Id. at 541.  Dr. Wangard found that Plaintiff possessed mild limitations to understand and remember simple and complex instructions, to make judgments about simple and complex work-related decisions, and to execute complex instructions.  Id. at 544.  Plaintiff also had moderate limitations regarding her ability to interact with the public, supervisors, and co-workers due to irritability, resistance, and fatigue.  Id. at 545.

### f.      Plaintiff's Testimony

During the administrative hearing, Plaintiff testified that she constantly experiences debilitating headaches and dizziness throughout the day which, she claimed, require two to three hours of daily silence in a dark room.  Id. at 43–44.  She also reported that prolonged sitting makes her legs stiffen, which necessitates elevation of her feet to chest level for four hours each day.  Id. at 45–48.  Plaintiff further stated that she only sleeps one to three hours per night due to her sleep apnea, thus requiring daily naps during the day.  Id. at 48–49. According to Plaintiff, her regular physical activities include helping her mother with daily chores, helping her grandnephew with homework, and occasionally shopping at the grocery store.  Id. at 50–51. Plaintiff alleged that her shopping trips were short due to her inability to lift more than ten pounds or walk more than one mile without resting.  See id. at 47, 51.  Plaintiff's mother corroborated most of Plaintiff's assertions in a separate functions report, but added that Plaintiff's shopping trips can last up to one-and-a-half hours and that Plaintiff also attends a weekly sports camp to cheer for her grandnephew.  Id. at 247–48.

### g.       The VE's Testimony

At the administrative hearing, the ALJ obtained testimony from a VE, who classified Plaintiff's prior work as a cashier and a general office clerk as light work.  Id. at 33.  The ALJ then asked the VE to identify any jobs in the national economy that would be available to a hypothetical person with physical and mental limitations and a vocational history similar to Plaintiff's.  See id. at 34.  The ALJ gave the VE several such hypothetical claimants, each with increasing levels of impairment.

In the first hypothetical, the ALJ described a person who could lift and carry twenty pounds occasionally and ten pounds frequently, and who could stand and/or walk for four hours and sit for roughly six hours in an eight-hour workday.  Id.  This hypothetical person could never climb ladders, ropes, or scaffolds and could never crawl.  Id.  In response, the VE stated that such a person would be capable of performing a general office clerk's tasks, as defined in the DOT.  Id. at 35.  This hypothetical person formed the initial parameters for the ALJ's subsequent hypotheticals.

In the second hypothetical, the ALJ asked the VE to assume an additional limitation that this hypothetical person would require the ability to alternate between sitting and standing every thirty minutes.  Id. at 35–36.  The VE opined that such a person would still be able to perform a general office clerk's tasks.  Id. at 36.  For the third hypothetical, the ALJ asked how much time a general office clerk could be off-task during the usual workday while still remaining competitively employable.  Id.  The VE responded that most employers would require such a person to be off-task less than 15% of the time to maintain that position.  Id.  Additionally, the ALJ asked how many days of work such a person could miss each month.  Id.  The VE's response to ALJ's fourth hypothetical was that most employers would only tolerate someone in

such a position to have one absence per month to remain employed. Id. at 36–37. Unlike the

VE's answers to the first hypothetical, her answers to hypotheticals two through four were based

on her own experience, rather than the DOT's definitions. See id. at 37.

For the fifth hypothetical, the ALJ changed the initial parameters for the hypothetical

claimant. Id. at 52. The ALJ described a person who could lift and carry ten pounds

occasionally and less than ten pounds frequently, and who could stand and/or walk for two hours

and sit for roughly six hours in an eight-hour workday. Id. This hypothetical person could never

climb ladders, ropes, or scaffolds and could never crawl. Id. In response, the VE stated that

such a person would be incapable of performing Plaintiff's past work as a general office clerk.

Id. However, a person with those limitations – as well as an additional limitation that required

this person to only frequently reach, handle, finger, and push or pull – could work as a

surveillance system monitor, information clerk, or charge account clerk, all of which are

categorized as sedentary, unskilled jobs. Id. at 52–53.[10] This hypothetical person formed the

baseline for the ALJ's remaining hypotheticals.

The ALJ's additional limitation for hypothetical six required the hypothetical person to

have the ability to alternate between sitting and standing every thirty minutes. Id. at 53–54. The

VE opined that such a person would be just as able to work at the sedentary, unskilled jobs she

defined. Id. at 54. For the seventh hypothetical, the ALJ described a person with additional

limitations that prevented such a person from operating foot controls, from climbing ladders,

---

[10] Sedentary work involves

> lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a).

ropes, or scaffolds, from balancing or crawling, and from tolerating exposure to unprotected heights, moving mechanical parts, or pulmonary irritants like dust and fumes.  Id.  This person could only occasionally climb ramps or stairs, stoop, kneel, and push or pull with both arms.  Id. at 54–55.  The VE testified that those limitations would not preclude such a person from working at the jobs she had listed.  Id. at 55.

Plaintiff, through her attorney, offered additional hypotheticals to the VE.  Id. at 57.  For hypothetical eight, Plaintiff asked if a limitation to tolerate only moderate noise would preclude the person described in hypothetical seven from work.  Id.  In response, the VE testified that such a limitation was acceptable at the jobs she defined.  Id. at 57–58.  The ninth hypothetical described a person who could only sit for two hours and stand or walk for an additional two hours during an eight-hour workday.  Id. at 58.  The VE responded that no sedentary work would be available to such a person.  Id.  Additionally, for hypothetical ten, Plaintiff asked the VE if a person who could not focus on a monitor and required less than frequent interactions with the public due to headaches could maintain the work at the jobs the VE had listed.  Id. at 59–60.  The VE responded in the negative, but stated that other sedentary jobs would be available, including work as a sedentary assembler and sedentary packer, as long as that same person could stay on-task at least 85% of an eight-hour workday.  Id. at 61.

4.    The ALJ's Decision

On April 7, 2014, the ALJ found Plaintiff ineligible for disability benefits.  Id. at 22.  The ALJ evaluated Plaintiff's conditions based on the above evidence in the administrative record. Id. at 18–19.  The Court recounts the relevant portions of the ALJ's findings below.

### a. Determining Plaintiff's RFC

Applying the required five-step process for evaluating disability claims, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since June 30, 2011, her alleged disability onset date. Id. at 16. At step two, the ALJ determined that Plaintiff was diagnosed with severe medical impairments related to symptoms of obesity, headaches, and respiratory disorders. See id.[11] At step three, the ALJ found that none of Plaintiff's severe impairments met or equaled the severity of the listed impairments in Appendix 1 of 20 C.F.R. Part 404, Subpart P. Id. at 17. Since Plaintiff's impairments did not meet a pre-defined listing, the ALJ then considered the administrative record to arrive at Plaintiff's RFC. Id.

Examining the objective medical evidence, opinions of physicians, and Plaintiff's testimony, the ALJ determined that Plaintiff's RFC allowed the performance of light work, with the additional caveat that she also required the ability to alternate between sitting and standing every thirty minutes. Id. at 17–19. In assessing Plaintiff's subjective representations, the ALJ explained that while Plaintiff's "determinable impairments could reasonably be expected to cause the alleged symptoms[,] . . . [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible[.]" Id. at 18. The ALJ further stated that "the medical evidence . . . [did] not substantiate disabling limitations within the relevant period of review." Id.

The ALJ noted that many of Plaintiff's severe impairments were adequately controlled by medication or other treatments. Id. He first highlighted Dr. Hoyos' sleep study, which showed

---

[11] Plaintiff's "severe impairments" included: obesity, bilateral calcaneal spurs, type II diabetes mellitus, hypertension, asthma, neuropathic pain, cervical spine degenerative disc disease and spondylosis, seasonal allergies, obstructive sleep apnea, bilateral carpal tunnel syndrome, headache, periodic leg movement disorder, vertigo, and allergic rhinitis. AR 16. Plaintiff's other alleged impairments, including hyperlipidemia, right kidney calculus, status post hysterectomy, left ear disorders, sinusitis, and ventral hernia, were not deemed "severe." Id.

that Plaintiff's obstructive sleep apnea is adequately managed through a CPAP machine.  Id. at 18, 446.  That study also revealed her periodic leg movement disorder, but Dr. Hoyos recommended daily walks to manage that condition.  Id. at 18, 517.  Additionally, simply taking medication allowed Plaintiff to control her diabetes, hypertension, neuropathic pain, and respiratory-related impairments (i.e., asthma, allergic rhinitis, and seasonal allergies).  Id. at 18, 466–68.  Further, the ALJ noted that Plaintiff's records indicate she was "treated only briefly" over three months for her carpal tunnel syndrome, headaches, and vertigo.  Id. at 19, 417–21, 431.  The ALJ also found the record "largely unremarkable" regarding Plaintiff's calcaneal spurs and degenerative disc disease.  Id. at 19, 349, 352.  Finally, the ALJ considered Plaintiff's obesity according to the governing regulations.  Id. at 19.[12]

After reviewing available medical opinions, the ALJ first assigned "limited weight" to the opinion of Dr. Aleskow.  AR 19.  Regarding Dr. Aleskow's report, the ALJ "considered [his] opinion . . . but [did] not find it persuasive, nor [did the ALJ] necessarily find it to be [Dr. Aleskow's] opinion."  Id. at 19.  Dr. Aleskow reported that Plaintiff had no limitations to her range of motion, yet he noted that she could only sit up to ten minutes, stand up to fifteen minutes, and walk up to thirty minutes.  Id. at 502.  The ALJ determined that "Dr. Aleskow essentially incorporated [Plaintiff's] reports into the medical source statement attached to his examination report[.]"  Id. at 19.  The ALJ found these limitations "hard to fathom . . . when [Dr. Aleskow's] examination noted full range of motion of all extremities[.]"  Id.

The ALJ also considered the medical opinions of Drs. Wangard, Hoyos, Grim, and Williams.  Id. at 19–20.  He assigned "some weight" to the opinion of Dr. Hoyos because he was

---

[12] The ALJ failed to list any functional limitations resulting from Plaintiff's medically diagnosed obesity that could affect her RFC assessment.  See SSR 02-1p, 2002 WL 34686281, at *7 (Sept. 12, 2002).  However, the Court need not address this omission further because Plaintiff does not dispute the ALJ's cursory consideration of her obesity.

"an examining source." Id. at 20. The ALJ noted that Dr. Hoyos evaluated Plaintiff's sleep study results and recommended that she avoid driving or operating heavy machinery until complete resolution of her daytime sleepiness. Id. The opinions of Drs. Grim and Williams were accorded "great weight" because the ALJ found them to be most consistent with the entire record. Id. The ALJ noted that these State agency medical consultants had both denied Plaintiff's disability claim because she "could perform a reduced range of light work." Id. The ALJ did not reveal the weight he assigned to the opinion of Dr. Wangard, the psychological examiner. Id. at 19.

As for Plaintiff's testimony, she alleged needing to spend up to three hours in a dark room each day due to headaches and up to four hours elevating her legs due to edema, but the ALJ found that her symptoms were adequately controlled through medication and brief treatment regimens. Id. at 18–19. The ALJ further noted Plaintiff's "limited earnings history." Id. at 18.[13] Next, the ALJ remarked that Plaintiff's regular physical activities "suggest[ed] greater abilities than alleged." Id. at 18. The ALJ believed that Plaintiff's ability to shop and assist her grandnephew with homework both contradicted her assertions regarding substantial time spent in a dark room or with her legs elevated. Id. The ALJ further noted that Plaintiff regularly smokes cigarettes despite medical counseling to end her habit. Id.

Although the ALJ did not expressly mention Dr. Weir's name, the ALJ analyzed his findings as they pertained to Plaintiff's headaches. See id. at 19, 415. He disregarded Plaintiff's complaints of headaches because she was "treated only briefly with a neurologist for the

---

[13] The ALJ failed to explain the relevance of Plaintiff's work history, the length of which can show a claimant's genuine desire to work – or to avoid work. See Sumners v. Astrue, No. 09–5065–CV–S–RED–SSA, 2010 WL 2955367, at *4 (W.D. Mo. July 23, 2010). Yet Plaintiff does not dispute the ALJ's determination regarding her credibility in this proceeding, so the Court will not address this point further.

headache . . . between April 2011 and July 2011." Id. at 19. Moreover, her treatment from Dr. Weir only consisted of oral medication. Id. at 415.

After considering this evidence, the ALJ concluded that Plaintiff had the RFC to perform "a reduced range of light work." Id. at 20. Specifically, the ALJ found that Plaintiff can

> occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk 4 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, occasionally feel bilaterally, and never climb ladders, ropes and scaffolds and crawl. [Plaintiff] requires the ability to the ability to [sic] alternate between sitting and standing about every 30 minutes.

Id. at 17.

### b.      Finding that Plaintiff Could Return to Past Relevant Work

After determining that Plaintiff's RFC limited her to "a reduced range of light work," the ALJ proceeded to step four of his analysis. Id. at 20. He evaluated Plaintiff's capability to perform her past work as a general office clerk and concluded, based on the DOT and testimony from the VE, that Plaintiff retained the capacity to perform that previous job. Id. Therefore, the ALJ found that Plaintiff was not disabled under step four. Id.

### c.      Finding that Plaintiff Could Adjust to Other Work

Proceeding to step five in the alternative, the ALJ examined whether Plaintiff could perform other light work available in the national economy in light of her age, education, work experience, and RFC. Id. In reaching his decision, the ALJ again relied on the DOT and testimony from the VE. Id. at 21. The VE testified that Plaintiff's physical and mental capabilities would satisfy the requirements for employment as a surveillance systems monitor, information clerk, or charge account clerk. Id. at 52–53. The ALJ therefore found that Plaintiff was also not disabled under step five. Id. at 21.

5.       Plaintiff's Complaint in the District Court

Having exhausted her administrative remedies, Plaintiff commenced this action in this

Court under 42 U.S.C. § 405(g), seeking review of the Commissioner's denial of her claim for

disability benefits.  She requests that the Court reverse the Commissioner's decision, or, in the

alternative, issue an order remanding the case to the Commissioner for a new administrative

hearing.  Pl. Mot. at 20.

## LEGAL STANDARD

A district court has jurisdiction over a civil case challenging a final disability decision of

the Commissioner.  42 U.S.C. § 405(g).  The court has the authority to reverse or remand the

Commissioner's decision if it is neither supported by substantial evidence nor made in

accordance with applicable law or regulations.  See Richardson v. Perales, 402 U.S. 389, 401

(1971); Simms v. Sullivan, 877 F.2d 1047, 1047 (D.C. Cir. 1989).  Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Richardson, 402 U.S. at 401 (citation and quotation marks omitted).  Substantial evidence

requires "more than a mere scintilla of evidence, but can be satisfied by something less than a

preponderance of the evidence."  Fla. Mun. Power Agency v. Fed. Energy Regulatory Comm'n,

315 F.3d 362, 365–66 (D.C. Cir. 2003).  The reviewing court must also determine whether the

ALJ "'has analyzed all evidence and has sufficiently explained that weight he has given to

obviously probative exhibits.'"  Simms, 877 F.2d at 1050 (quoting Stewart v. Sec'y of HEW,

714 F.2d 287, 290 (3d Cir. 1983)).

The district court's role is not to reweigh the evidence but only to determine whether the

ALJ's findings are based on substantial evidence and a correct interpretation of the law.  Butler,

353 F.3d at 999.  The plaintiff bears the burden to prove that the Commissioner's decision is not

supported by substantial evidence.  <u>Callahan</u>, 786 F. Supp. 2d at 93; <u>Brown v. Barnhart</u>, 408 F.

Supp. 2d 28, 31 (D.D.C. 2006).  The D.C. Circuit has instructed that "[i]f the case is one that

involves the taking of additional evidence for any reason, the district court is obligated to obtain

an enhancement or revision of the record by way of remand to the [Commissioner]" rather than

outright reversal.  <u>Callahan</u>, 786 F. Supp. 2d at 93 (quoting <u>Ignoia v. Califano</u>, 568 F.2d 1383,

1389 (D.C. Cir. 1977)).

## DISCUSSION

Plaintiff seeks reversal of the ALJ's decision denying her disability benefits based

primarily on an expansive construction of one clause in one sentence in the decision.  <u>See</u> AR 19;

Pl. Mot. at 9.  Specifically, she challenges the ALJ's statement that he "[did] not find [Dr.

Aleskow's report] persuasive, nor [did he] necessarily find it to be [Dr. Aleskow's] opinion."

<u>See</u> AR 19; Pl. Mot. at 9.  Plaintiff claims that this sentence indicates that the ALJ failed to

properly consider Dr. Aleskow's opinion when assessing Plaintiff's RFC and that the ALJ failed

to properly develop the administrative record in light of Dr. Aleskow's report.  Pl. Mot. at 7, 16.

Plaintiff also argues that permitting the ALJ to reject Dr. Aleskow's report would infringe upon

the public interest – that is, in Plaintiff's view, the ALJ should not be permitted to "undermine[]

the entire evaluation process" by disbelieving what a physician's report actually says.  <u>Id.</u> at 19.

The Court will address only these arguments below, bearing in mind that its role when reviewing

the Commissioner's disability decisions is "not to determine . . . whether [Plaintiff] is disabled,"

but to assess only whether the ALJ's findings are "not based on substantial evidence and a

correct application of the law."  <u>Butler</u>, 353 F.3d at 999.

**A.** **Substantial Evidence Supports the ALJ's Decisions**

      1.    Consideration of Medical Evidence in Determining Plaintiff's RFC

Plaintiff challenges the ALJ's RFC assessment as failing "to properly consider the relevant medical evidence in the case." Pl. Mot. at 7. Plaintiff's primary argument relies on a single sentence of the ALJ's decision, wherein the ALJ assigned "limited weight" to Dr. Aleskow's opinion because he "[did] not find it persuasive, nor [did he] necessarily find it to be [Dr. Aleskow's] opinion." AR 19. Plaintiff contends that the ALJ's dismissive tone "essentially disregard[s] favorable evidence for [Plaintiff] as impossible, simply because it does not correlate with the ALJ's initial interpretation of the claim." Pl. Mot. at 11. After reviewing the entire record, this Court disagrees. It finds that the sentence at issue merely reflects the ALJ's reasonable assessment of problematic aspects – both external and internal – of Dr. Aleskow's report. Additionally, Plaintiff challenges the ALJ's cursory analysis of her headaches. Id. at 13. She asserts that the ALJ failed to credit Dr. Weir's report "when it is supported by both [Plaintiff's] testimony and Dr. Aleskow's opinions." Id. However, this Court finds that Plaintiff's headaches were properly disregarded because the record reflects that they improved with conservative treatment.

To determine a claimant's RFC, the ALJ must consider "all of the available evidence," including laboratory findings, medical opinions, and statements from the claimant, to evaluate the intensity and persistence of the claimant's symptoms. 20 C.F.R. § 416.929(c)(1). The ALJ may disregard a physician's opinion "if that opinion is brief, conclusory, and inadequately supported by clinical findings." Pinkney v. Astrue, 675 F. Supp. 2d 9, 18 (D.D.C. 2009). However, the ALJ must "build an accurate and logical bridge from the evidence to [his]

conclusion" so the reviewing court may "afford a claimant meaningful judicial review." Lane-Rauth v. Barnhart, 437 F. Supp. 2d 63, 67 (D.D.C. 2006) (internal quotation marks omitted).

### a. Assigning Limited Weight to Dr. Aleskow's Opinion

Here, substantial evidence supports the ALJ's decision to give Dr. Aleskow's opinion "limited weight" when determining Plaintiff's RFC.  First, the ALJ's statement indicates a finding that Dr. Aleskow's report merely parroted Plaintiff's subjective complaints.  AR 502; see Cerruti v. Comm'r of Soc. Sec., No. 6:13–cv–1273–Orl–GJK, 2015 WL 685735, at *3 n.4 (M.D. Fla. Feb. 18, 2015) ("The ALJ understandably assigned [the treating physician's opinion] little weight because [it] . . . appear[s] to parrot the claimant's subjective allegations.").  This reading is supported by the ALJ's finding that "Dr. Aleskow essentially incorporated [Plaintiff's] reports into the medical source statement."  AR 19.  During Plaintiff's consultative visit with Dr. Aleskow, she reported problems sitting more than ten minutes, standing more than fifteen minutes, and walking more than several blocks.  Id. at 496.  Then, in Dr. Aleskow's medical source statement, he stated that Plaintiff could sit no more than ten minutes, stand no more than fifteen minutes, or walk more than thirty minutes, id. at 502, which the ALJ determined to be "consistent with walking several blocks," id. at 19.  The ALJ had no obligation to further consider Dr. Aleskow's parroted findings because, as discussed below, they were contradicted by other medical opinions and by other findings within his report.  See Everett v. Comm'r of Soc. Sec., No. 1:11–cv–219, 2012 WL 3731388, at *11 (S.D. Ohio Aug. 28, 2012) (disregarding a physician's assessment when she parroted the plaintiff's specific hand limitations was proper because the limitations were unsupported by medical findings); see also Stewart v. Astrue, No. ED CV 11–852–PLA, 2012 WL 487467, at *6 (C.D. Cal. Feb. 15, 2012) (obligating the ALJ to

further consider statements made in a function report because the ALJ failed to identify which specific statements were parroting the plaintiff's complaints).

Second, Dr. Aleskow's opinion was contradicted by the opinions of both Dr. Grim and Dr. Williams – the State agency medical consultants to whom the ALJ assigned "great weight." See AR 20, 72, 82. Dr. Aleskow reported that Plaintiff had no limitations to her range of motion, but he also noted that she could only sit for two hours and stand or walk for one hour during an eight-hour workday. Id. at 502. Meanwhile, Dr. Grim opined that Plaintiff could sit for six hours and stand or walk for four hours during an eight-hour workday. Id. at 70. Dr. Grim also noted that Plaintiff's reported limitations conflicted with her regular physical activities, including grocery shopping and attending a sports camp with her grandnephew. Id. Likewise, Dr. Williams determined that Plaintiff could sit for six hours and stand or walk for four hours during an eight-hour workday, noting that Plaintiff could walk up to half a mile without interruption. Id. at 78–80. Dr. Williams opined that Plaintiff remained capable of performing sedentary work. Id. at 82. Both Dr. Grim and Dr. Williams determined that Plaintiff was not disabled. Id. at 72, 82. Accordingly, the ALJ's decision to discount Dr. Aleskow's opinion that Plaintiff was severely limited in her ability to work was supported by substantial evidence in the record. See Turner v. Colvin, 964 F. Supp. 2d 21, 31–33 (D.D.C. 2013) (finding substantial evidence supported the ALJ's rejection of a treating physician's opinion because it conflicted with other medical evidence, including that physician's treatment notes and the opinions of multiple State agency medical consultants).

Third, the ALJ properly discounted Dr. Aleskow's opinion because he found inconsistencies within Dr. Aleskow's report itself. AR 19. Again, Dr. Aleskow's examination revealed no limitations to Plaintiff's range of motion in her extremities or her spine. Id. at 19,

497. His examination also found that Plaintiff could walk on her heels and toes, squat, rise from a squatting position, and tandem walk without difficulty. Id. The ALJ stressed the internal discrepancy between such findings and Dr. Aleskow's conclusion that the same person suffers from substantial restrictions to sitting, standing, and walking. Id. at 19. For that reason, he assigned "limited weight" to Dr. Aleskow's opinion, reasonably inferring that someone with such severe movement limitations should also possess at least some limitation to the range of motion in her limbs or spine. See id. at 19.

Further, it bears emphasis that Dr. Aleskow was merely a consultative examiner for purposes of Plaintiff's disability claim and not her treating physician. See id. at 495. Dr. Aleskow only examined Plaintiff once, pursuant to the SSA's request. Id. at 495–507. As a consultative physician, Dr. Aleskow's opinions are not entitled to any presumption of weight and are therefore more easily rejected. See Mastroni v. Bowen, 646 F. Supp. 1032, 1036 (D.D.C. 1986) ("[L]imited weight should be given to the report of a consulting physician who only briefly examines [the] plaintiff on a single occasion."); see also Williams v. Shalala, 997 F.2d 1494, 1498 (D.C. Cir. 1993) (holding that treating-physician opinions are presumed to be "binding on the fact-finder unless contradicted by substantial evidence"). Thus, the ALJ's rejection of Dr. Aleskow's opinion did not warrant additional explanation, and the ALJ provided the logical bridge required to connect the evidence with his conclusions. See Lane-Rauth, 437 F. Supp. 2d at 67.

### b.  Disregarding Plaintiff's Headaches

Substantial evidence also supports the ALJ's disregard of Plaintiff's headaches and assessment of their limited impact on her RFC. Plaintiff asserts that the ALJ failed to properly credit the report of Dr. Weir, her neurologist, "when it is supported by both [Plaintiff's]

testimony and Dr. Aleskow's opinions." Pl. Mot. at 13. In Dr. Weir's April 14, 2011, report, he

noted Plaintiff's complaints of daily headaches that required her to lay down for three hours. AR

415. The ALJ found that Plaintiff's headaches only required three months of medical treatment,

id. at 18, but, as Plaintiff points out, she reported "severe daily headaches" as recently as the

March 7, 2014, administrative hearing, Pl. Reply at 4. Further, Plaintiff reported "severe

headaches on a daily basis" to Dr. Aleskow during his examination on December 20, 2013. AR

495. Plaintiff contends, therefore, that "the ALJ . . . failed to fully consider . . . whether Dr.

Aleskow's consultative opinion [was] actually supported by" Dr. Weir's report. Pl. Mot. at 14.

This argument fails because the ALJ Plaintiff's headaches were properly disregarded in

light of their improvement with conservative treatment. During the administrative hearing,

Plaintiff claimed to spend up to three hours each day in a dark room due to headaches. AR 43–

44. However, the ALJ determined that her testimony was "not entirely credible" in light of her

ability to shop, to tutor her grandnephew and travel to a weekly sports camp with him, and to

perform daily chores around her house. Id. at 18. He also noted that Plaintiff's assertions of

severe headaches were contradicted by her conservative treatment history. See id. at 18–19. The

record supports these findings. During Plaintiff's April 4, 2011, evaluation by Dr. Weir, she

reported "massive headaches" that wake her in the morning and may last all day. Id. at 415. By

July 15, 2011, Plaintiff reported that her prescribed medication made these headaches occur "less

often" and feel "a little less severe." Id. at 420–21.

While the ALJ incorrectly reported the length of Plaintiff's treatment history regarding

her headaches, their management through conservative treatment negates reversal on this ground.

In his decision, the ALJ found "diagnoses of headache and unspecified peripheral vertigo," but

he disregarded those impairments because Plaintiff was "treated only briefly with a neurologist

for the headache [and] vertigo." Id. at 19.[14]  Indeed, the ALJ's decision only includes Dr. Weir's

treatment records from April 2011 through July 2011.  Id. at 19, 415–21.  Yet Dr. Weir

subsequently prescribed cyclobenzaprine, and later methocarbamol, to Plaintiff, id. at 534–36,

and Dr. Aleskow noted that Plaintiff continued taking methocarbamol during his consultation on

December 20, 2013, id. at 495.  The ALJ therefore erred in determining that Plaintiff was

"treated only briefly" for her headaches, id. at 19, but this was a harmless error.

While Plaintiff's headaches may have persisted through December 20, 2013, so did her

conservative treatment of them.  See id. at 18–19; see also Lee v. Barnhart, 214 F. App'x 660,

661 (9th Cir. 2006) ("[T]he medical evidence . . . supported the [ALJ's] determination that [the

plaintiff] was not disabled . . . because he suffered from an impairment that improved

with conservative treatment[.]").  During Plaintiff's initial medical assessment on April 14, 2011,

she reported "massive headaches" but no vomiting or nausea.  AR 415.  On July 15, 2011,

following Dr. Weir's first prescription of amitriptyline, Plaintiff reported that her headaches

became "a little less severe" and occurred "less often."  Id. at 421.  The record indicates that Dr.

Weir's treatment effectively managed Plaintiff's headaches, and they never worsened.  She

complained of severe headaches to other treating physicians on August 27, 2013, but they

prescribed no additional treatments because the headaches were "being managed by Dr. Weir."

Id. at 483–84.  Similarly, Dr. Aleskow noted Plaintiff's headache complaints during her

consultation on December 20, 2013, but he also reported that Plaintiff managed them by taking

methocarbamol daily.  Id. at 496.

---

[14] Plaintiff raises the "treating physician rule" in her motion brief, Pl. Mot. at 15, but this issue is triggered only
when the ALJ rejects the treating physician's opinion, see Espinosa v. Colvin, 953 F. Supp. 2d 25, 32 (D.D.C. 2013)
(citing Butler, 353 F.3d at 1003).  Here, the ALJ's analysis of Plaintiff's headaches is consistent with Dr. Weir's
conservative treatment, as Plaintiff's medical history indicates.  See AR 414–24, 532–36.

Moreover, Plaintiff's self-reported work and medical histories reveal that she was employed during the period in which she allegedly suffered from severe headaches. According to Plaintiff's disability application, she worked as a general office clerk between August 2004 and December 2010. Id. at 223. As for the date on which Plaintiff's headaches started, her reports differ. See id. at 415 (reporting July 2010), 420 (reporting 1993), 496 (reporting 2009). However, by all accounts it appears that Plaintiff worked for a period between five months and six years while suffering from her severe headaches, see id. at 223, yet she reported improvements with treatment which only began as recently as April 2011, see id. at 415. Plaintiff's headaches certainly did not disable her through December 2010 – the month in which she stopped working – and the ALJ correctly disregarded those headaches in light of their subsequent improvement with treatment. See Clark v. Astrue, 826 F. Supp. 2d 13, 23 (D.D.C. 2011) (finding that the ALJ's decision "was supported by the record evidence," which indicated improvements to the plaintiff's symptoms with treatment); see also 20 C.F.R. § 416.920(a)(4)(i) ("If you are doing substantial gainful activity, [the SSA] will find that you are not disabled."). Therefore, the Court finds no basis to disturb the ALJ's RFC findings.

2.      Development of the Administrative Record

Plaintiff next challenges the ALJ's decision not to seek further clarification from Dr. Aleskow regarding his report after not "find[ing] it to be his opinion." Pl. Mot. at 16. This contention also lacks merit. The ALJ has a duty to "investigate fully all matters at issue and to develop the comprehensive record requisite for a fair determination of disability." Poulin v. Bowen, 817 F.2d 865, 870 (D.C. Cir. 1987). Meanwhile, the claimant has a duty to provide medical evidence showing the severity of her impairments. Clark, 826 F. Supp. 2d at 24. An ALJ may arrange for an additional examination of a claimant at the SSA's expense if the

necessary information "is not readily available from the record" or the ALJ cannot "seek clarification from [the claimant's] medical source." 20 C.F.R. § 416.912(e). However, no additional investigation is necessary "where there is no obvious gap or defect in the administrative record." Turner v. Astrue, 710 F. Supp. 2d 95, 108 (D.D.C. 2010); see Rothe v. Astrue, 766 F. Supp. 2d 5, 13–14 (D.D.C. 2011) (finding that the administrative record was adequately developed because it contained "no critical gaps" in the pro se plaintiff's medical information and held "enough evidence to make a fair, objective assessment" regarding the plaintiff's claims).

The Court rejects Plaintiff's argument that the ALJ was required to initiate an additional investigation into Dr. Aleskow's report. First, the ALJ adequately developed the administrative record, which contained no critical gaps and contained adequate medical evidence for a fair, objective assessment of Plaintiff's disability status. See Rothe, 766 F. Supp. 2d at 13–14; AR 13. Plaintiff's disability claim has an onset date of June 30, 2011, and the record includes Plaintiff's medical history from well before that date. AR 31.[15] In preparation for Plaintiff's March 7, 2014, administrative hearing, the SSA also paid for two consultative examinations. See id. at 492–507 (Dr. Aleskow's December 30, 2013, physical examination), 537–51 (Dr. Wangard's February 21, 2014, psychological examination). This record is at least as complete as the one found adequate in Rothe. See Rothe, 766 F. Supp. 2d at 13–14 (during the period in which the plaintiff sought disability benefits, the administrative record included treatment notes, test results, related prescriptions, and evaluation charts from multiple treating physicians).

---

[15] The SSA is required to develop Plaintiff's records up to twelve months prior to the alleged onset date. See 20 C.F.R. § 404.512(d). The administrative record included Plaintiff's hospital records from September 21, 2009, through August 27, 2013. See AR 337–52, 458–91. The Court notes a five-month treatment gap between March 20, 2012, and August 30, 2012, see id. at 454–57, but Plaintiff's argument pertains to the ALJ's decision not to seek clarification of Dr. Aleskow's opinion from December 20, 2013. Pl. Mot. at 17.

Moreover, all of the information on which the ALJ's decision was based is readily available from the record. 20 C.F.R. § 416.912(e). For the reasons discussed above, the ALJ reasonably relied on the available medical evidence to reach his decision regarding Plaintiff's disability. Not only did the ALJ consider medical opinions of Drs. Hoyos, Wangard, Aleskow, Grim, and Williams, AR 19–20, but he also considered the medical records pertaining to each of Plaintiff's severe impairments, id. at 18–19. Finally, Plaintiff remains represented by her attorney. See Pl. Reply at 9. Unlike Rothe, which involved a pro se plaintiff, the ALJ in this case had no heightened duty to develop the record. See Rothe, 766 F. Supp. 2d at 13. Therefore, it fell to Plaintiff to arrange for any additional medical records to be made available to the ALJ before his decision. See Clark, 826 F. Supp. 2d at 24.

As before, the true thrust of Plaintiff's argument is quite narrow. Specifically, Plaintiff argues that if the ALJ did not find Dr. Aleskow's report to "be his opinion," the ALJ should have issued "further interrogatories to Dr. Aleskow or [made] attempt[s] to further develop the record through a supplemental consultative examination." Pl. Mot. at 17. This argument is wholly without merit. Again, the ALJ's statement does not suggest that he thought Dr. Aleskow's opinion was unclear. Rather, it merely indicated the ALJ's assignment of limited weight to the opinion. See AR 19. As the Court discussed above, the ALJ's decision to reject Dr. Aleskow's findings was supported by substantial evidence.

**B.** **The ALJ's Findings Do Not Affect the General Public Interest**

Plaintiff finally contends that the ALJ's decision contravenes public policy because it purportedly "disregard[s] medical evidence . . . simply because it did not say what the ALJ believed that it should say." Pl. Mot. at 18–19. Public interest considerations in SSA cases apply when "a decision raises or addresses a question which has potentially far-reaching

applicability for a significant number of claims."  SSR 82-13, 1982 WL 31370, at *3 (Jan. 1, 1982).  Here, the Court finds no such issue, particularly because Plaintiff simply reincorporates the arguments previously analyzed under other, more appropriate standards.

Plaintiff warns that "[p]ermitting the ALJ to find that a doctor's report does not mean what is plainly written" violates public policy because the ALJ could disregard medical evidence simply because he does not find the opinion credible.  Pl. Mot. at 18–19.  Unfortunately for Plaintiff, that is precisely what the ALJ is expected to do.  See Grant v. Astrue, 857 F. Supp. 2d 146, 156 (D.D.C. 2012) ("The credibility determination is solely within the realm of the ALJ.  A reviewing court will only intercede where an ALJ fails to articulate a rational explanation for his or her finding.").  As long as the ALJ provides an adequate basis for his assignment of evidentiary weight, as he did here, this Court cannot reverse his decision.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Judgment of Reversal [Dkt. 15] will be **DENIED** and Defendant's Motion for Judgment of Affirmance [Dkt. 16] will be **GRANTED**.  An Order consistent with this Memorandum Opinion will be filed contemporaneously herewith.


Date:  July 13, 2016                                    _____
                                                        G. MICHAEL HARVEY
                                                        UNITED STATES MAGISTRATE JUDGE